**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

RODNEY O. SCOTT,
        Plaintiff,

v.
                                                Action No. 2:17cv176

VIRGINIA PORT AUTHORITY, *et al.*,
        Defendants.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

       This matter comes before the Court on motions to dismiss filed by defendants Virginia International Terminals, LLC (ECF No. 37), Michael L. Brewer (ECF No. 35), Hampton Roads Shipping Association (ECF No. 39), and International Longshoremen's Association, Local 1624 (ECF No. 61), a motion to quash by International Longshoremen's Association, Local 1624 (ECF No. 58), and a request for entry of default against International Longshoremen's Association, Local 1624 filed by plaintiff, Rodney O. Scott (ECF No. 60).  The first three motions to dismiss were referred to the undersigned on October 23, 2017 and ECF Nos. 60 and 61 were referred on February 5, 2018.

       For the reasons stated herein, the Court **RECOMMENDS** that Virginia International Terminals' motion be **GRANTED**, Michael L. Brewer's motion be **GRANTED in part and DENIED in part**, Hampton Roads Shipping Association's motion be **GRANTED**, International Longshoremen's Association, Local 1624's motions be **GRANTED**, and Scott's request for default be **DENIED**.

## I.    FACTUAL BACKGROUND

Beginning in 1988, Rodney O. Scott ("Scott"), an African American resident of Chesapeake, Virginia, worked as a longshoreman and waterfront worker for approximately 30 years for various employers. Am. Compl., ECF No. 32 ¶¶ 12, 28. Scott was employed by defendant Virginia International Terminals, LLC ("VIT"), in Norfolk, Virginia until VIT terminated his employment on April 1, 2016. Am. Compl. ¶ 28. Scott alleges that two of his Caucasian co-workers, Toby Paulk and Mike Albertson, harassed Scott and directed racial epithets and otherwise derogatory language towards him during 2015 and 2016. Am. Compl. ¶ 49. Scott's two co-workers allegedly harassed and intimidated Scott on March 27, 2016, as Scott prepared to begin work. Am. Compl. ¶ 50. Scott responded by "telling his two co-workers that he would 'kill them' if he thought they would do something, as they continued to harass and abuse him." *Id.* Scott was unarmed at the time. *Id.*

Toby Paulk reported to VIT management that Scott had threatened him and Mike Albertson, and did not report any inciting actions on his part. Am. Compl. ¶ 51. VIT then terminated Scott's employment and notified him that he was permanently ineligible to work for VIT as of April 1, 2016. Am. Compl. ¶ 52. VIT did not hold a hearing regarding the incident. *Id.* Toby Paulk and Mike Albertson continued their employment with VIT. Am. Compl. ¶ 53.

Defendant Michael L. Brewer ("Brewer") is the Chief of Police for the Virginia Port Authority ("VPA") in Hampton Roads, Virginia. Am. Compl. ¶ 29. Brewer made the decision to confiscate Scott's credentials and badge, prohibiting Scott from entering onto property owned and operated by the VPA. Am. Compl. ¶ 54. Brewer notified Scott of this decision in a letter dated June 17, 2016, in which Brewer explained that there was no appeal process and offered to meet with Scott to discuss his decision. Am. Compl., Ex. 6. Brewer also stated that the decision

2

rested solely with him and that he made the decision after an independent police investigation. *Id.* Brewer did not take any action against Toby Paulk or Mike Albertson. Am. Compl. ¶ 59.

According to Scott, Brewer placed false information in Scott's file, "including information that falsely accused Scott as a violent person who is a violent threat to other workers on the waterfront." Am. Compl. ¶ 18. He also alleges that Brewer "illegally publicized untrue statements and innuendo that Scott engaged in inappropriate acts, including false statements that accused Scott of potential criminal activity," Am. Compl. ¶ 8, and that Brewer published "this information to prospective and private employers of Scott and to private third parties," Am. Compl. ¶ 22.

Scott further alleges that a VIT management employee gave false information to Scott's co-workers, and that VIT placed false information in his personnel file stating "that Scott was guilty of wrongdoing and misconduct at work." Am. Compl. ¶¶ 91–92. Scott alleges that other employers in the industry "would likely request information from VIT and VPA from its records regarding Scott's disciplinary records, his security clearance records with VPA and VIT, and will further inspect the reasons for the ending of Scott's long term work and employment." Am. Compl. ¶ 19. Indeed, Scott alleges that he believes prospective employers have already requested and seen such information, and that Scott's co-workers have also seen such information. Am. Compl. ¶¶ 20–22.

According to the amended complaint, defendant Hampton Roads Shipping Association ("HRSA") qualifies employees to work in the longshore industry and provides port numbers to employees that allow them to work on the waterfront. Am. Compl. ¶ 34. On February 21, 2017, HRSA sent Scott a letter notifying him that his port number was in danger of being deactivated because he had worked for less than 150 hours during the last quarter of 2016. Am. Compl., Ex.

7.   The letter identified the Port Number Review Committee ("PNRC") as the entity with decision-making authority, and is signed by the executive vice-president of the HRSA.  *Id.*  The letter stated that if Scott did not return to work by March 22, 2017, and work 150 hours in the next quarter, his port number would not be maintained.  *Id.*

International Longshoremen's Association, Local 1624 ("Local 1624" or "union") is a labor union which represents employees in the longshoremen's industry, including Scott.  Am. Compl. ¶ 32.  HRSA members and Local 1624 are subject to a collective bargaining agreement ("CBA").[1]  Section 25 of the CBA creates a contract board, which is an entity comprised of equal numbers of HRSA management and labor union members which administers and interprets the CBA.  ECF No. 10-1 at 18–21.  The PNRC is a subcommittee, also made up of equal members of Local 1624 and HRSA members, which is responsible for maintaining port numbers.  Am. Compl. ¶ 77, ECF No. 10-1 at 18, 50.

Local 1624 filed a grievance letter on Scott's behalf with the contract board.  ECF No. 10-1 at 56, Ex. B.  The letter, dated October 10, 2016, indicates that Local 1624 filed a grievance with the contract board on Scott's behalf, based on Scott's contention that "his termination [was] unjust and excessive" and that Scott denied the allegations against him.  *Id.*  The grievance letter did not allege that VIT discriminated against Scott based on his race in terminating him.  *Id.*  Scott's grievance was raised at a meeting of the contract board on October 18, 2016, and was tabled at the suggestion of the vice president of Local 1624, Rob Versprille.[2]  ECF No. 10-1 at 57, Ex. C.  Scott's grievance was again on the agenda at a November 22, 2016 meeting of the

---

[1] The CBA between HRSA members and Local 1624 can be found, among other places, at ECF No. 10-1, at 5–65, Ex. A-1, A-2, A-3.

[2] The meeting minutes do not specify why the union moved to table Scott's grievance.  The CBA states that "[a]n agenda item may be postponed until the next meeting if the interested party is not present or one of the parties requests an extension."  ECF No. 10-1 at 20.  Scott was not present at either meeting of the contract board.

contract board, and again tabled at the request of Local 1624, this time indefinitely.  ECF No. 10-1 at 64, Ex. D.

## II.    PROCEDURAL HISTORY

On June 16, 2016, Scott filed formal charges of employment discrimination with the United States Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII of the Civil Rights Act against the VPA.  Am. Compl., Ex. 1, ECF No. 32.  He filed an amended charge of discrimination with the EEOC against VIT and the VPA on September 6, 2016.  Am. Compl. ¶ 38; Am. Compl., Ex. 2.  On March 27, 2017, the EEOC issued Scott a notice of right to sue letter.  Am. Compl. ¶ 39; Am. Compl., Ex. 3.

On March 31, 2017, Scott filed a complaint against VIT, the HRSA, the VPA, and Brewer.  Compl., ECF No. 1.  On April 25, 2017, HRSA filed a motion to dismiss, ECF No. 7; VIT filed a motion to dismiss, ECF No. 9; and Brewer and the VPA filed a joint motion to dismiss, ECF No. 14.

Scott responded to these motions on May 11 and 12, 2017.  ECF Nos. 20–22.  Scott asked in the alternative for leave to amend his complaint.  ECF No. 20 at 15; ECF No. 21 at 9–10; ECF No. 22 at 7.  The Court granted Scott's request to amend on September 8, 2017, ECF No. 30, and denied the motions to dismiss as moot on October 6, 2017.  ECF No. 41.

Scott filed an amended complaint on September 17, 2017.  Am. Compl., ECF No. 32.  In his amended complaint, Scott no longer names the VPA as a defendant, but now names Local 1624 as a defendant.  Am. Compl. at 1.

Scott's first count is against Brewer individually and in his official capacity, pursuant to 42 U.S.C. § 1983.  Am. Compl. ¶¶ 60–67.  Scott alleges that Brewer violated his due process rights by confiscating his badge and credentials to work as a longshoreman on VPA property

5

without a "name clearing" hearing. Am. Compl. ¶¶ 61–63. Scott seeks injunctive relief requiring Brewer to reactivate Scott's credentials and return Scott's badge so that he may work on the waterfront once more. Am. Compl. ¶ 66. Scott also asks the Court to enjoin Brewer from violating Scott's or any other person's due process rights in the future. Am. Compl. ¶ 67.

In his second count, Scott alleges that VIT breached the CBA by engaging in discrimination in violation of Title VII of the Civil Rights Act and wrongfully terminating Scott's employment. Am. Compl. ¶¶ 68–74. Specifically, Scott alleges that VIT treated his Caucasian co-workers differently than himself when VIT disciplined Scott for an altercation between Scott and said co-workers. Am. Compl. ¶¶ 69–70, 72–73.

Scott's third count is against Local 1624 for breach of the duty of fair representation. Am. Compl. ¶¶ 75–80. Specifically, Scott alleges that Local 1624 failed to initiate a proper grievance proceeding on his behalf regarding his discrimination claim against VIT. Am. Compl. ¶ 76.

Scott's fourth count alleges that HRSA breached the CBA by not maintaining Scott's port number, despite being aware that Scott was at that time barred from working with VIT and from entering VPA property. Am. Compl. ¶¶ 81–89.

Finally, in count five, Scott alleges that VIT published defamatory information to potential future employers of Scott, as well as Scott's co-workers. Am. Compl. ¶¶ 90–95. The allegedly defamatory information is "VIT's decision that Scott was guilty of wrongdoing and misconduct at work," based on the threat Scott is alleged to have made. Am. Compl. ¶¶ 91–92.

On December 14, 2017, 88 days after filing the amended complaint, a summons was returned executed by Scott as to Local 1624. ECF No. 56. The summons was addressed to 1355 International Terminal Boulevard, Suite 201, Norfolk, Virginia 23505. *Id.* The proof of service

stated that the summons was left with Paulette Brown at the business of Larry A. Bachtell, President of Local 1624. *Id.* at 2.

On January 7, 2018, Local 1624 made a special appearance and filed a motion to quash service of process and dismiss the complaint, with a supporting memorandum.[3] ECF Nos. 58–59. The following day, on January 8, 2018, Scott filed a request for entry of default against Local 1624, claiming that it had not answered his complaint within 21 days of receiving service of process. ECF No. 60. Local 1624 filed a memorandum in opposition to that request on January 15, 2018. ECF No. 63. On January 23, 2018, Scott filed a memorandum opposing the motions to quash and to dismiss, and supporting his request for an entry of default.[4] ECF No. 64. Local 1624 replied on February 1, 2018. ECF No. 67.

### III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) allows a defendant to challenge a complaint on the ground that a court lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The plaintiff bears the burden to prove that the court has subject matter jurisdiction. *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). "In determining whether jurisdiction exists, the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Id.* Generally, allegations of Eleventh Amendment immunity are treated as challenges to subject matter jurisdiction. *See, e.g., Edelman v. Jordan*, 415 U.S. 651, 678 (1974). In considering a motion to dismiss under Rule 12(b)(1), a

---

[3] At the Court's request, Local 1624 refiled a separate document as a motion to dismiss, with a supporting memorandum. ECF Nos. 61–62. ECF Nos. 58–59 now refer only to the motion to quash.

[4] Scott's memorandum was filed minutes after the deadline, prompting Scott to file a motion for leave to file. ECF No. 65. The Court granted that motion on January 25, 2018. ECF No. 66.

court may consider evidence extrinsic to the complaint, such as the CBA in this case. *See Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss complaints, or claims within complaints, upon which no relief can be granted. Fed. R. Civ. P. 12(b)(6); *Sonnier v. Diamond Healthcare Corp.*, 114 F. Supp. 3d 349, 354 (E.D. Va. 2015). In order to survive a motion to dismiss, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This pleading standard requires that the complaint state a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In essence, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Ascertaining whether a complaint states a plausible claim for relief is a "context-specific task" that requires the court to "draw on its judicial experience and common sense." *Id.* at 679.

A motion to dismiss pursuant to Rule 12(b)(6) challenges "the sufficiency of a complaint; it does not resolve disputes over factual issues, the merits of a claim, or the applicability of a defense." *SunTrust Mortg., Inc. v. Simmons First Nat'l Bank*, 861 F. Supp. 2d 733, 735 (E.D. Va. 2012) (citing *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). Therefore, "[i]n ruling on a 12(b)(6) motion, a court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)). The factual allegations, however, "cannot be mere speculation, and must amount to more than 'a sheer possibility that a defendant has acted unlawfully.'" *Brach v.*

8

*Conflict Kinetics Corp.*, 221 F. Supp. 3d 743, 747 (E.D. Va. 2016) (quoting *Iqbal*, 556 U.S. at 678). In addition, "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well-pled facts for Rule 12(b)(6) purposes." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (citing *Iqbal*, 556 U.S. at 678).

## IV.   ANALYSIS

### A. Counts two and five against Virginia International Terminals should be dismissed.

#### 1. Count two against Virginia International Terminals is barred by the statute of limitations.

VIT argues that Scott's discrimination claim is barred by the statute of limitations contained in section 301 of the Labor Management Relations Act ("LMRA"). ECF No. 38 at 2–6. Section 301 of the LMRA states that "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties." 29 U.S.C. § 185(a). Section 301 thus preempts state law suits for breach of contract when labor contracts are involved. Suits pursuant to section 301 are governed by federal substantive law, and the Supreme Court has interpreted section 301 as "a congressional mandate to the federal courts to fashion a body of federal common law to be used to address disputes arising out of labor contracts." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 209 (1985) (citing *Textile Workers v. Lincoln Mills*, 353 U.S. 448 (1957)).

Ordinarily, before an employee can bring suit against an employer for breach of a collective bargaining agreement, the employee must exhaust any grievance or arbitration remedies provided in the agreement. *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652–53 (1965). However, the Supreme Court has "recognized that this rule works an unacceptable

9

injustice when the union representing the employee in the grievance/arbitration procedure acts in such a discriminatory . . . fashion as to breach its duty of fair representation." *DelCostello v. Int'l Broth. Of Teamsters*, 462 U.S. 151, 164 (1983). Accordingly, employees may bring a "hybrid" claim: a suit against the employer pursuant to section 301, and a suit against the union "for breach of the union's duty of fair representation, which is implied under the scheme of the National Labor Relations Act." *Id.* While seemingly two separate causes of action, they are "inextricably interdependent," and form a hybrid claim governed by its own rules of substantive law. *Id.*

Here, counts two and three of Scott's amended complaint comprise a hybrid section 301/duty of fair representation claim. Count two alleges that VIT breached the CBA by discriminating against Scott in violation of Title VII. Am. Compl. ¶¶ 68–74. Section 46 of the CBA provides that "[t]he employer members of HRSA and the ILA agree that . . . they will not discriminate against any employee because of race . . . and will comply with all applicable laws prohibiting discrimination [including] Title VII of the Civil Rights Act of 1964." ECF No. 10-1 at 44. That section also provides that "[a]ny and all disputes, claims, charges or complaints arising under this Section, including those claiming a violation of Title VII . . . shall be brought before the Contract Board." *Id.* at 40. Count two thus comprises the first component of the hybrid claim, a suit against an employer for breach of a collective bargaining agreement. Count three alleges that Local 1624 breached its duty of fair representation in failing to file a proper grievance for discrimination with the contract board on Scott's behalf. Am. Compl. ¶¶ 75–80. Count three comprises the second half of the hybrid claim.

A six-month statute of limitations applies to section 301 hybrid claims. *Foy v. Giant Food Inc.*, 298 F.3d 284, 291 (4th Cir. 2002) (applying six-month statute of limitations to a

10

section 301 hybrid action alleging that employer breached a collective bargaining agreement in discharging employee); *Smith v. United Parcel Serv., Inc.*, 776 F.2d 99, 100 (4th Cir. 1985) (same); *see also* 29 U.S.C. § 160(b) (establishing six-month statute of limitations for complaints filed with the National Labor Relations Board).   The six months "begins to run when an employee discovers, or should have discovered, the acts constituting the alleged violation." *Tall v. MV Transp.*, No. RWT 12-417, 2012 WL 4480720, at *3 (D. Md. Sept. 27, 2012), *aff'd* 512 F. App'x 355 (4th Cir. 2013) (citing *Simmons v. Howard Univ.*, 157 F.3d 914, 916 (D.C. Cir. 1998)).   "[T]he claim arises when the plaintiff could first successfully maintain a suit based on that cause of action, or when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation." *Gilfillan v. Celanese Ag*, 24 F. App'x 165, 167 (4th Cir. 2001) (internal citations omitted).   Generally, this will mean when he discovered or should have discovered the union chose not to represent him in the grievance process. *See id.* at 166.

In Scott's original complaint, filed on March 31, 2017, he did not allege that Local 1624 failed to adequately represent him in the pursuit of his grievance against VIT.   *See generally* Compl., ECF No. 1.   Scott added Local 1624 as a defendant in his amended complaint, filed on September 17, 2017.   ECF No. 32.   VIT argues that Scott knew or should have known of his claim against the union by December 2016, at the latest, rendering his September 2017 amended complaint beyond the six-month statute of limitations.   ECF No. 38 at 4.   Scott argues that he was not aware that Local 1624 had breached its duty of fair representation until April 25, 2017,

when he saw for the first time the grievance letter filed by the union with the contract board, which was attached to VIT's previously filed motion to dismiss.[5]  ECF No. 46 at 5.

Scott's amended complaint alleges that "Scott afforded ample opportunities for ILA Local 1624 to represent him on this discrimination claim through at least December 31, 2016, but Local 1624 never acknowledged this claim of Scott['s] or offered to represent him on the discrimination claims."  Am. Compl. ¶ 5.  Scott does not explain, either in the amended complaint itself or in his brief, the significance of the December 31, 2016 date.  The reading urged by VIT is that December 31, 2016 is when Scott became aware that the union was not representing him on his discrimination claim.  The Court agrees with this reading.  Scott argues in his opposition brief that he was unaware, prior to April 25, 2017, that the union had not pursued his discrimination claim, but his own amended complaint contradicts this statement.  Based on the amended complaint, by late December 2016, nearly nine months after Scott's termination, Scott had still received no indication from the union that it was pursuing his discrimination claim, despite Scott having given the union "ample opportunities" to do so.  Am. Compl. ¶ 5.  At the very least, even if Scott did not actually know, it should have been apparent to him by December 2016 that the union was not pursuing his discrimination claim.  *See Starnes v. Veeder-Root*, No. 1:15cv1002, 2017 WL 913633, at *11–12 (M.D.N.C. Mar. 7, 2017) ("'[t]o

---

[5] Scott's statement about not receiving the grievance letter until April 25, 2017 appears nowhere in his amended complaint.  The letter, and the tabling of the grievance at future meetings of the contract board, indicates that the union did not advance the specific grievance that Scott desired, and perhaps indicates that the union did not diligently pursue Scott's case.  However, based only on the allegations in the amended complaint, prior to receiving the letter, Scott had no concrete indication that the union had done *anything at all* on his behalf.  Thus, it is implausible that the grievance letter was the first indication to Scott that Local 1624 was not advocating diligently on his behalf with respect to his discrimination claim.  Scott must also act diligently on his rights, or risk losing them, and it is unlikely that Scott could not have obtained a copy of a letter filed by his union on his behalf through the exercise of due diligence in the more than five months between the letter on October 10, 2016 and his filing suit on March 31, 2017.

say, . . ., that the running of the statute of limitations will be postponed indefinitely until actual notification is received from the Union or the employer, would be contrary to the policy of prompt resolution. Lack of notification would leave claims unresolved indefinitely and leave the procedure open to all the vices which statutes of limitations were intended to eliminate.'") (quoting *Samuels v. Am. Transit Corp.*, 595 F. Supp. 840, 843 n.5 (M.D.N.C. 1984)).

Nor is Scott's hybrid claim tolled by virtue of filing a charge with the EEOC. "The statute of limitations does not toll because a plaintiff files a complaint with an administrative body." *Minor v. Washington Metro. Area Transit Auth.*, No. 8:12cv1061, 2013 WL 3776365, at *3 (D. Md. July 16, 2013) (holding that the filing of an EEOC charge did not toll the six-month statute of limitations for a hybrid claim) (citing *Kolomick v. United Steelworkers of Am. District 8*, 762 F.2d 354, 355–57 (4th Cir. 1985) (holding that a complaint to the National Labor Relations Board did not toll the statute of limitations in a section 301 hybrid claim, because section 301 serves as an exception to the agency's preemptive jurisdiction)).

Scott's claim of unfair representation may still be timely if it relates back to the filing of the original complaint. Rule 15 of the Federal Rules of Civil Procedure permits a party to amend its pleadings when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence . . . in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Courts in this circuit consider "whether there was (1) a sufficient factual nexus between the amendments and the prior pleadings and (2) whether defendant had sufficient notice of these new claims such that he will not suffer prejudice if the amendments are found to relate back." *McCray v. Infused Solutions, LLC*, No. 4:14cv158, 2017 WL 4111958, at *6 (E.D. Va. Sept. 15, 2017) (citing *U.S. ex rel. Carter v. Halliburton Co.*, 315 F.R.D. 56, 61–63 (E.D. Va. 2016)).

The relation back inquiry here is not whether Local 1624 was put on notice in the original complaint, because "plaintiffs suing under a § 301/[duty of fair representation] theory need not sue their union at all: it could hardly be that the running of the limitations period as to the union extinguishes the right of action against the employer." *White v. White Rose Food, a Div. of DiGiorgio Corp.*, 128 F.3d 110, 116 (2d Cir. 1997). Nevertheless, the Court must still analyze whether VIT was on notice that it would have to defend against a claim that Scott was not fairly represented by his union during the grievance procedure, and whether there is a sufficient factual nexus between the claims in the original and amended complaints. This is so because Scott's claims against the union and VIT are "'interlocked: neither claim is viable if the other fails.'" *Thompson v. Aluminum Co. of Am.*, 276 F.3d 651, 657 (4th Cir. 2002) (quoting *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1241 (7th Cir. 1997)). "The key factor in a hybrid § 301 suit is not who the plaintiff chooses to sue, or which parties appear before the court, but rather what the plaintiff must prove in order to recover." *Int'l Longshoremen's Ass'n v. Va. Int'l Terminals, Inc.*, 938 F. Supp. 335, 338 (E.D. Va. 1996). As the Supreme Court put it in *DelCostello*:

> [T]he two claims are inextricably interdependent. To prevail against either the company or the Union [the plaintiff] must not only show that [his] discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the Union. The employee may, if he chooses, sue one defendant and not the other; but the case he must prove is the same whether he sues one, the other, or both.

*DelCostello*, 462 U.S. at 164–65 (internal quotations omitted).

In arguing that the claim does not relate back to the original complaint, VIT relies on *Heaning v. NYNEX-New York*, 945 F. Supp. 640 (S.D.N.Y 1996). ECF No. 38 at 5–6. In *Heaning*, the plaintiff originally brought a complaint against his employer claiming that his termination violated a collective bargaining agreement. *Heaning*, 945 F. Supp. at 642–43. Later,

in opposition to summary judgment, the plaintiff submitted an affidavit which purported to show that he "was inadequately represented by union officials."[6] *Id.* at 643. Judge Sotomayor, then a district judge, held that the hybrid claim did not relate back to the original complaint, because the "new allegations shift[ed] the primary focus of th[e] case from the propriety of [plaintiff's] discharge . . . to the adequacy of his Union counsel." *Id.* at 648. Accordingly, the court determined that the claim was barred by the six-month statute of limitations.

In other cases, courts have found no relation back when employees initially filed complaints against their employers based on improper arbitration decisions, and subsequently amended those complaints to add union defendants, transforming their claims into hybrids. *See Holmes v. Greyhound Lines, Inc.*, 757 F.2d 1563, 1566 (5th Cir. 1985); *Painter v. Mohawk Rubber Co.*, 636 F. Supp. 453, 455–56 (W.D. Va. 1986). Courts have further found that a claim related to the grievance or arbitration procedure and a claim related to the underlying grievance do not share a common set of operative facts. *See Wolf Mech., Inc. v. Plumbers Local No. 98 Detroit MI of the United Ass'n of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the U.S. and Canada, AFL-CIO*, No. 07-14199, 2008 WL 11355533, at *3 (E.D. Mich. Nov. 10, 2008) (citing *Tecam Elec. v. Local Union 701, IBEW*, No. 01 C 3333, 2001 WL 1338985, at *6 (N.D. Ill. Oct. 29, 2001); *Penn. Eng'g Corp. v. Islip Recovery Agency*, 714 F. Supp. 634, 638 (E.D.N.Y. 1989)).

Scott argues that there is a common nucleus of operative facts—namely the incident on March 27, 2016 and the biased treatment Scott received afterwards. ECF No. 46 at 6–7. Further, Scott argues that he filed a charge of discrimination with the EEOC related to that incident, and

---

[6] While the plaintiff did not include allegations against the union in his complaint, or an amended complaint, the court treated the affidavits as attempting to allege a new hybrid claim. *Heaning*, 945 F. Supp. at 647 (citing *McKee v. Transco Prods., Inc.*, 874 F.2d 83, 86–87 (2d Cir. 1989)).

15

that the EEOC would have provided VIT with notice of the charge. *Id.* As for Scott's first argument, as stated above, courts have drawn a distinction between challenges to representation received during a grievance process and the grievance itself. While the March 27, 2016 incident and termination certainly form the basis of the underlying grievance, the facts related to the union's representation of Scott would be quite different. Such facts would not focus on the termination and confrontation between Scott and his co-workers, but instead on Local 1624's actions, or inactions, in bringing Scott's claim before the contract board. If the cases cited above followed Scott's argument, the outcomes would have been different. In *Heaning*, for instance, the plaintiff's claim against his employer was based on his termination, and his claim against the union was based on the union's alleged failure to adequately represent him in connection with that termination. 945 F. Supp. 642–43. Based on Scott's argument, both claims would share an operative set of facts, namely, the reason for Heaning's termination. The court in that case rejected such an argument. *Id.* at 648.

Scott's second argument falls prey to the same defect. Neither EEOC charge mentions a claim against the union for breach of the duty of fair representation. *See* ECF Nos. 32-1, 32-2. VIT does not assert that it was unaware of Scott's claim of discrimination in connection with his termination, which was clearly included in the original complaint, but that the claim that VIT discriminated against Scott and the claim that Local 1624 did not fairly represent him are based on different facts and circumstances. The EEOC charge does nothing to rebut this.

Accordingly, Scott's hybrid claim was filed after the expiration of the six-month statute of limitations, and the allegations that the union breached the duty of fair representation do not relate back. The claim is time-barred. The Court recommends that count two be **DISMISSED** with **PREJUDICE**.

### 2.  Scott's defamation claim in count five is preempted by section 301 of the LMRA.

VIT next argues that Scott's defamation claim is preempted by section 301 of the LMRA and that, even if not preempted, Scott fails to allege the elements of a defamation claim. ECF No. 38 at 7–11.  Generally, a claim of defamation would be a state law cause of action. *See Tharpe v. Saunders*, 737 S.E.2d 890, 892 (Va. 2013).  However, when the defamation arises in connection with a labor contract, the state law claim may be preempted by the LMRA. "Preemption occurs only when resolution of a state law claim depends upon the meaning of the collective bargaining agreement, or when resolution of the state law claim is 'inextricably intertwined with consideration of the terms of the labor contract.'" *Mullins v. Int'l Union of Operating Eng'rs Local No. 77 AFL-CIO of Washington, D.C.*, 214 F. Supp. 2d 655, 668 (E.D. Va. 2002) (holding that plaintiff's defamation claim was preempted by section 301) (quoting *Allis-Chalmers*, 471 U.S. at 213); *see also Augustin v. SecTek, Inc.*, 807 F. Supp. 2d 519, 525 (E.D. Va. 2011); *Martin v. Watkins*, No. 7:10cv423, 2011 WL 836996, at *4 (W.D. Va. Mar. 3, 2011) (collecting cases).

Preemption is important here because under the LMRA, an employee must usually exhaust any arbitration remedies provided in a collective bargaining agreement, or the lawsuit will be dismissed. *Republic Steel Corp.*, 379 U.S. at 653 ("[T]here can be no doubt that the employee must afford the union the opportunity to act on his behalf.").[7]  A failure to exhaust grievance remedies divests the federal court of subject matter jurisdiction over the case.

---

[7] As discussed in the previous section, this requirement may be short-circuited if the union does not adequately and fairly represent the employee. In this case, Scott has alleged a breach of fair representation with respect to his discrimination claim, but not with respect to any claim of defamation against VIT. *See* Am. Compl. ¶ 75–80. Accordingly, no hybrid claim potential exists with respect to count five.

In *Mullins*, this Court found a defamation claim preempted by section 301 where the collective bargaining agreement required the employer to "provide the Union with written reasons for the termination of employees" and granted the employer "the right to respond to grievances filed by the Union." 214 F. Supp. 2d at 669. In *Augustin*, this Court found a defamation claim preempted by section 301 where the collective bargaining agreement stated "that discharge matters [were] subject to the grievance and arbitration procedures set forth within the agreement" and that the allegedly defamatory report and termination letter were "events surrounding Plaintiff's discharge." 807 F. Supp. 2d at 525.

The present case bears similarities to *Mullins* and *Augustin*. The alleged defamatory material in this case was information placed in Scott's personnel file subsequent to his termination, as well as information relayed by a VIT management employee to Scott's co-workers as to why VIT decided to terminate Scott's employment. Am. Compl. ¶¶ 91–92. This is information related to Scott's discharge, as was the case in *Augustin*. Further, the CBA addresses issues of discipline, termination, and the right to file a grievance. *See* ECF No. 10-1, at 21–23. Under this precedent, Scott's defamation claim is "inextricably intertwined with consideration of the terms of the CBA." *Augustin*, 807 F. Supp. 2d at 525.

Scott argues that "the Court should find [defamation based on the allegation that Scott threatened to kill his co-workers] to be an exception to the requirement of a generic grievance procedure." ECF No. 46 at 8. Scott cites no authority that would justify the Court finding that such an exception exists. Additionally, courts are often reluctant to carve holes into a collective bargaining agreement's arbitration process. *See, e.g., Safrit v. Cone Mills Corp.*, 248 F.3d 306, 308–09 (4th Cir. 2001) ("To redact one clause from the CBA would in effect alter the agreement reached during the often-difficult collective bargaining process.").

18

Scott also states that "there is a distinction to be made for conduct that may be required to be brought by a grievance that does not impugn[ ] the character and reputation of an employee, such as sleeping on the job, for example, and on the other hand, allegations that an employee committed an act of theft or dishonesty." ECF No. 46 at 8. Scott does not state where this distinction arises, and the Court finds no such distinction in the CBA. To the contrary, the CBA covers discipline for sleeping on the job ("shirking of work"), in section 26, the same section that it covers discipline for an act of theft ("pilferage"). ECF No. 10-1 at 21. Notably, section 26 also covers discipline for "abusive language." *Id.* Again, Scott appears to be asking the Court to fashion a distinction out of whole cloth.

Other courts have also rejected the distinction Scott urges. In *Garley v. Sandia Corp.*, 236 F.3d 1200, 1203–04 (10th Cir. 2001), the plaintiff was fired for allegedly falsifying his timecard. He sued his former employer for, *inter alia*, defamation, claiming that his termination for timecard fraud branded him as dishonest. *Id.* at 1206. Notwithstanding that the defamation claim was based on an allegation of dishonesty, the Tenth Circuit Court of Appeals found that the defamation claim was preempted by section 301 because it arose in connection with the plaintiff's termination. *Id.* at 1211.

VIT has cited three instances where this Court has found that it lacks subject matter jurisdiction to hear claims covered by the same CBA in this case when the plaintiffs failed to exhaust their arbitration remedies. ECF No. 38 at 9 (citing *Washington v. Hampton Roads Shipping Ass'n*, No. 2:01cv880, 2002 WL 32488476, at *4–5 (E.D. Va. May 30, 2002) (Smith, J.), *aff'd* 57 F. App'x 173 (4th Cir. 2003); *Coleman v. Hampton Roads Shipping Ass'n*, No. 2:02cv354 (E.D. Va. Dec. 13, 2002) (Jackson, J.) (ECF No. 10-2); *Sumter v. Hampton Roads Shipping Ass'n*, No. 2:10cv396 (E.D. Va. Feb. 14, 2011) (Davis, J.) (ECF No. 10-3)). The same

19

disposition is appropriate in this case.  Scott has not exhausted his administrative remedies, because he did not pursue his defamation grievance before the contract board, nor does he allege that Local 1624 refused to pursue his defamation claim.  Because the Court lacks subject matter jurisdiction over the defamation claim, the Court need not address VIT's argument that Scott has failed to state a claim for defamation.

For the foregoing reasons, the Court recommends that count five be **DISMISSED** without **PREJUDICE**, *see S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 185 (4th Cir. 2013) ("A dismissal for lack of standing—or any other defect in subject matter jurisdiction—must be one without prejudice, because a court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits."); *Austin v. Owens-Brockway Glass Container, Inc.*, 78 F.3d 875, 886 (4th Cir. 1996) (holding that dismissal without prejudice is appropriate when lacking subject matter jurisdiction due to an arbitration clause); Fed. R. Civ. P. 41(b).

## B.  Michael Brewer's motion to dismiss should be granted in part and denied in part.

In his motion to dismiss, Brewer argues (1) that Scott's section 1983 claim is barred by the Eleventh Amendment; (2) Brewer is not a person under section 1983; (3) Brewer is entitled to qualified immunity; and (4) Scott has failed to state a claim for a violation of due process. ECF No. 36.

### 1.  Brewer is not protected by Eleventh Amendment immunity.

The Eleventh Amendment provides that "[t]he Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Where a suit is brought against a state official, the "question arises as to whether that suit is a suit

20

against the State itself." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984). Generally speaking, Eleventh Amendment immunity extends to state officers sued in their official capacities. *Id.* at 101–02.

*Ex parte Young*, 209 U.S. 123 (1908) provides an exception to Eleventh Amendment immunity. Under *Ex parte Young*, "federal courts may exercise jurisdiction over claims against state officials by persons at risk of or suffering from violations by those officials of federally protected rights, if (1) the violation for which relief is sought is an ongoing one, and (2) the relief sought is only prospective." *Republic of Paraguay v. Allen*, 134 F.3d 622, 627 (4th Cir. 1998). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997)).  This exception applies only to prospective relief, and "does not permit judgments against state officers declaring that they violated federal law in the past." *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993).

Brewer argues that the *Ex parte Young* exception is inapplicable, because the prospective relief Scott seeks is not intended to remedy an ongoing violation.  The Court disagrees.  The Fourth Circuit has described *Coakley v. Welch*, 877 F.2d 304 (4th Cir. 1989), as a "classic claim[] of ongoing violations of federally-protected property and liberty rights." *Republic of Paraguay*, 134 F.3d at 628.  In *Coakley*, the South Carolina Port Authority ("SPA") terminated Coakley, prompting him to bring suit alleging that he was denied his procedural due process rights. *Coakley*, 877 F.2d at 305.  The district court dismissed the action against the SPA on

sovereign immunity grounds, but allowed the case to move forward against SPA officials for injunctive relief, specifically reinstatement. *Id.* The Fourth Circuit affirmed. *Id.* at 307. The Fourth Circuit rejected the SPA officials' argument that the termination was only a past action, stating that "Coakley has alleged SPA conduct that, while no longer giving him daily attention, continues to harm him by preventing him from obtaining the benefits of SPA employment." *Id.* at 307 n.2. The court continued, stating that cases from other circuits "suggest that few, if any, suits are barred for failure to allege an 'ongoing violation'" and that "courts treat the issue of whether a violation is 'ongoing' as related to the issues of whether prospective relief is appropriate, or whether the requested relief would operate instead as an illegitimate award of retroactive damages." *Id.*

Recently, the Fourth Circuit distinguished *Coakley* in *Jemsek v. Rhyne*, 662 F. App'x 206 (4th Cir. 2016) (unpublished). Jemsek was a licensed physician practicing in North Carolina whose license was suspended by the North Carolina Medical Board ("NCMB") for one year in 2006, subject to Jemsek taking certain actions. *Id.* at 208. In 2008, the NCMB launched another investigation, and informed Jemsek that the investigation would cease if he allowed his medical license to become inactive. *Id.* Jemsek voluntarily agreed, but brought suit against the NCMB in 2012 seeking to rescind the 2006 order and a 2008 letter of reprimand. *Id.* The Fourth Circuit held that Jemsek had not alleged an ongoing violation, but merely sought "an injunction rescinding past state action." *Id.* at 212 n.5. In distinguishing the case from *Coakley*, the Fourth Circuit found it important that the NCMB did not terminate Jemsek's license, nor did the NCMB "prohibit him from seeking to resume his medical practice in North Carolina." *Id.*

This case is more similar to *Coakley* than the unpublished opinion in *Jemsek*. Scott alleges that Brewer ejected him from port authority property and confiscated his badge and

credentials. Am. Compl. ¶ 10. Scott seeks a court order requiring that Brewer reinstate Scott's credentials and reactivate his badge so that Scott is able to enter VPA property. *Id.* at 33–34. This requested relief is not about purging some past wrongful action that has no present effect, such as the suspension in *Jemsek*. Rather, this is prospective relief which seeks to remedy present harm to Scott, namely, that he is unable to enter VPA property.[8] Just as Coakley was harmed by being denied the benefits of SPA employment, Scott is harmed by being denied the benefits of VPA access. *See also CSX Transp., Inc. v. Bd. of Public Works of State of W. Va.*, 138 F.3d 537, 541–42 (4th Cir. 1998) (stating that "a future injunction is not made retrospective merely because it recognizes that an ongoing violation of law is the result of a past wrong").

Brewer's attempts to distinguish *Coakley* are unavailing. Brewer first argues that Scott was never an employee of VPA, whereas Coakley was an employee of SPA. ECF No. 52 at 3. While certainly an important distinction in some contexts, the distinction does not matter here. The harm experienced by Coakley was not ongoing merely because the tortfeasor was his employer. The harm allegedly suffered by Scott, not being able to enter VPA property and work on such premises, continues to this day and is ongoing.

As for Brewer's argument that the requested injunctive relief is not designed to correct a violation of federal law because Scott was not deprived of a protected liberty or property interest, that argument will be considered in Part B.3. *See* ECF No. 52 at 3–4.

---

[8] The Court does not pass judgment at this stage about whether the particular relief sought would be appropriate or justified in the instant case, or whether some other prospective relief would be more appropriate.

## 2. Scott has properly sued Brewer in his official capacity but not in his individual capacity.

Brewer's second argument is that he is not a "person" within the meaning of section 1983, and is thus immune from suit. *Id.* at 4–5. Brewer argues that Scott has not alleged facts sufficient to support a suit against him in his individual capacity, and that all of the allegations are for conduct taken pursuant to Brewer's official authority. *Id.* Brewer additionally argues that, to the extent he is being sued in his individual capacity, he is entitled to qualified immunity.[9] *Id.* at 5–6.

Title 42, United States Code, section 1983, provides that: "[e]very person who, under color of [state law], subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

"[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989) (citing *Brandon v. Holt*, 469 U.S. 464, 471 (1985)). Neither a state, nor its officials sued in their official capacities are "persons" under section 1983 when sued for

---

[9] Scott argues that Brewer has prematurely raised the issue of qualified immunity and that, as an affirmative defense, qualified immunity "must be raised after the filing of [his] answer to the merits of Scott's complaint." ECF No. 20, at 7. Scott provides no citation for this argument, either to a federal rule of civil procedure or to a case. Scott further argues that a determination of whether Brewer is entitled to qualified immunity will not "prevent the case from proceeding on its merits for the conducting of discovery to determine the facts of any alleged defense of immunity." *Id.* This argument misunderstands the purpose of qualified immunity, which "is meant to give government officials a right, not merely to avoid standing trial, but also to avoid the burdens of such pretrial matters as discovery . . . , as inquiries of this kind can be peculiarly disruptive of effective government." *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996) (holding in part that a defense of qualified immunity can be raised in a motion to dismiss) (internal quotations omitted).

monetary damages. *Will*, 491 U.S. at 71. However, "[o]f course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Will*, 491 U.S. at 72 n.10 (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)). Scott's claim in count one seeks only prospective injunctive relief, and thus *Will* does not remove Brewer from the scope of section 1983 to the extent he is sued in his official capacity.

Scott also sues Brewer in his individual capacity. A suit for monetary damages can be maintained under section 1983 against a state official acting in his individual capacity. "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law." *Graham*, 473 U.S. at 165 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 237–38 (1974)).

Brewer argues that, because the amended complaint names him as a defendant "for the actions he took against Scott with the actual and apparent authority given to him by VPA," Brewer is being sued only for acts taken pursuant to his official duties, and therefore is not properly sued in his individual capacity. ECF No. 36 at 9–10 (quoting Am. Compl. ¶ 29 n.1). This argument misunderstands the distinction between official- and individual-capacity suits. As the Supreme Court stated in *Graham*, "[o]n the merits, to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Graham*, 473 U.S. at 166. That Brewer is alleged to have acted with authority given to him by the VPA does not mean that he cannot be sued in his individual capacity under section 1983. Rather, that allegation serves as the foundation for the "under color of state law" requirement of section 1983, which authorizes monetary suits against state officials in their individual capacities. Brewer's argument is effectively the same argument the Supreme

Court rejected in *Hafer v. Melo*, 502 U.S. 21, 27–28 (1991) ("[Hafer] asserts, state officials may not be held liable in their personal capacity for actions they take in their official capacity . . . we find [this argument] both unpersuasive as an interpretation of § 1983 and foreclosed by our prior decisions."). As the Court in *Hafer* stated, that argument "ignores our holding that Congress enacted § 1983 to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it." *Hafer*, 502 U.S. at 28 (citing *Scheuer*, 416 U.S. at 243) (internal quotation marks omitted).

Scott's claims against Brewer in his individual capacity are not without infirmity, however. As Scott notes in his memorandum in opposition, "Scott has not requested compensatory damages from this defendant[] but . . . seeks prospective injunctive relief, only." ECF No. 45 at 7. As the Supreme Court reiterated recently, distinguishing between individual- and official-capacity suits requires a court to look to the relief sought and determine whether the real party in interest is the government or the individual. *Lewis v. Clarke*, 137 S. Ct. 1285, 1291 (2017); *see also Minnesota v. Hitchcock*, 185 U.S. 373, 387 (1902) ("If whether a suit is one against a state is to be determined, not by the fact of the party named as defendant on the record, but by the result of the judgment or decree which may be entered"). "The general rule is that a suit is against the sovereign if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.'" *Dugan v. Rank*, 372 U.S. 609, 620 (1963) (quoting *Land v. Dollar*, 330 U.S. 731, 738 (1947); *Larson v. Domestic & Foreign Corp.*,

337 U.S. 682, 704 (1949)).[10]  Many courts have concluded that there is no basis for suing a

government official for injunctive relief in his or her individual capacity. *See, e.g., Ameritech*

*Corp. v. McCann*, 297 F.3d 582, 586 (7th Cir. 2002) (holding that "[t]he twin goals served by the

*Young* exception to Eleventh Amendment immunity—vindicating federal rights and holding state

officials responsible to federal law—cannot be achieved by a lawsuit against a state official in

his or her individual capacity"); *Feit v. Ward*, 866 F.2d 848, 858 (7th Cir. 1989) (holding that the

plaintiff's suit against the defendants in their individual capacities only was improper because

"the equitable relief [the plaintiff] request[ed] . . . [could] be obtained only from the defendants

in their official capacities, not as private individuals"); *Davidson v. U.S. Dep't of State*, 113 F.

Supp. 3d 183, 194 (D.D.C. 2015) ("It is well established that there is no basis for suing a

government official for declaratory and injunctive relief in his or her individual or personal

capacity.") (internal quotation omitted); *Hatfill v. Gonzales*, 519 F. Supp. 2d 13, 24–25 (D.D.C.

2007) (holding that the relief sought by the plaintiff, which was an injunction prohibiting the

defendants from stigmatizing the plaintiff's employment opportunities and from depriving the

---

[10] Courts have sometimes articulated exceptions to this general rule, such as: "(1) action by officers beyond their statutory powers and (2) even though within the scope of their authority, the powers themselves or the manner in which they are exercised are constitutionally void." *Littell v. Morton*, 445 F.2d 1207, 1213 (4th Cir. 1971) (internal quotations omitted). There is no allegation that Brewer lacks statutory authority to seize the credentials of those deemed a security risk. Scott does allege, however, that he performed his duty in an unconstitutional fashion. The constitutionally-void exception has been dramatically restricted since its first articulation. The Supreme Court has rejected a reading that would allow plaintiffs to bypass immunity based merely on the allegation that the defendant made a mistake regarding his authority. *See Pennhurst State Sch. & Hosp.*, 465 U.S. at 89. An *ultra vires* claim rests on "the officer's lack of delegated power. A claim of error in the exercise of that power is therefore not sufficient." *Larson*, 337 U.S. at 690. As the District Court for the District of Columbia has stated, in a case involving similar constitutional claims to this case, the '*ultra vires*' or authority stripping theory enunciated in *Young*—whereby a government official who acts unconstitutionally is stripped of his official or representative character—being nothing more than a 'legal fiction,' does not support maintaining a legal action against government officers in their individual capacity where equitable relief is sought." *Hatfill v. Gonzales*, 519 F. Supp. 2d 13, 22 (D.D.C. 2007).

27

rights of others in plaintiff's position, could only be obtained against the defendants in their official capacities).

In this case, Scott seeks the relief of the return of his badge and the reactivation of his credentials.  Am. Compl. ¶ 66.  Scott also seeks a court order enjoining Brewer from denying due process to Scott or other longshoremen.  Am. Compl. ¶ 67.  The relief Scott seeks is not against Brewer as an individual, but against the office Brewer holds.  Such relief would compel the government to act and impact the manner in which the government carries out its duties.  Accordingly, any claims against Brewer in his individual capacity are improper and should be **DISMISSED**.

Because suit against Brewer in his individual capacity is improper based on the type of relief sought, the Court need not address Brewer's qualified immunity argument.  *See Lewis*, 137 S. Ct. at 1291 ("The identity of the real party in interest dictates what immunities may be available. . . . An officer in an individual-capacity action . . . may be able to assert *personal* immunity defenses," such as qualified immunity.).  It does bear noting that the dismissal of Scott's claims against Brewer in Brewer's individual capacity does not preclude Scott from obtaining relief, but is merely a recognition that the relief Scott seeks is more properly against Brewer in his official capacity.  Scott may still obtain relief against Brewer in his official capacity if Brewer violated a constitutionally-protected interest.  The Court turns to that question now.

28

### 3. Scott has alleged the deprivation of a constitutionally-protected interest.

The crux of Scott's constitutional claim is that Brewer denied him a "meaningful and fair hearing" prior to confiscating his badge and credentials, which deprived him of "a liberty interest and due process protections" related to his "right to work and to be gainfully employed." Am. Compl. ¶ 61. The dispute between the two parties centers on three potential Fourteenth Amendment interests: (1) a liberty interest in accessing VPA property and the continued work attendant to it, ECF No. 45 at 16–18; (2) a property interest in Scott's continued possession of his badge and credentials, *id.* at 18–19; and (3) a liberty interest in his reputation, *id.* at 19–23.

The requirements of procedural due process apply when the plaintiff's interests in liberty and/or property have been denied. *Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972). Courts examine procedural due process questions in two steps. First, the court "asks whether there exists a liberty or property interest which has been interfered with by the State." *Ky. Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989) (citing *Roth*, 408 U.S. at 571)). Second, the court "examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Id.* (citing *Hewitt v. Helms*, 459 U.S. 460, 472 (1983)). Fourteenth Amendment interests must be more than "an abstract need or desire" and must be based on more than "a unilateral hope;" there must be a "legitimate claim of entitlement" to the interest. *Id.* (internal citations omitted).

The United States Constitution "does not require a trial-type hearing in every conceivable case of government impairment of private interest." *Cafeteria and Restaurant Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 894 (1961). "Due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Id.* at 895 (internal quotations omitted).

29

i.    **Brewer's actions in barring Scott implicated Scott's liberty interest in pursuing employment.**

Brewer argues that his actions in barring Scott from VPA property did not implicate any constitutionally-protected liberty interest.  ECF No. 36 at 14.  Brewer relies largely on *Artist v. Va. Int'l Terminals, Inc.*, 679 F. Supp. 587 (E.D. Va. 1988), *aff'd* 857 F.2d 977 (4th Cir. 1988). In *Artist*, the plaintiff was a tractor-trailer driver for a company which transported ship containers on property operated by VIT, and owned by VPA.  *Id.* at 588–89.  One day, plaintiff was involved in a fight with VIT employees.  *Id.*  As a result, VIT barred the plaintiff from VIT-operated property.  *Id.* at 589.  The plaintiff's usefulness to his employer was diminished as a result, and he soon thereafter resigned.  *Id.*  After determining that VIT acted under color of state law and was not entitled to Eleventh Amendment immunity, the Court concluded that VIT did not deprive the plaintiff of a property or liberty interest, and dismissed the case.  *Id.* at 590, 593–95.

This Court in *Artist* found the Supreme Court's decision in *Cafeteria Workers* to be "particularly instructive on th[e] asserted liberty interest" claim.  *Id.* at 594.  In *Cafeteria Workers*, a cafeteria worker, who was employed by a private company doing business on government property, was barred from a federal military installation because she was considered a security risk.  *Cafeteria Workers*, 367 U.S. at 887–88.  The district court granted summary judgment against the plaintiff and the Supreme Court affirmed, finding that "under the circumstances of this case [a hearing prior to action] was not constitutionally required."  *Id.* at 894.  Further emphasizing the specific nature of the inquiry, the Court stated that "[a]s these and other cases make clear, consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the

government function involved as well as the private interest that has been affected by governmental action." *Id.* at 895.

Neither *Artist* nor *Cafeteria Workers* controls this case. The Supreme Court in *Cafeteria Workers* took great pains to point out what was not at issue in that case. For instance, the Court stated that "it is to be noted that this is not a case where government action has operated to bestow a badge of disloyalty or infamy, with an attendant foreclosure from other employment opportunity. . . . There is nothing to indicate that [the government's] determination would in any way impair [the plaintiff's] employment opportunities." *Id.* at 898. To the contrary, in this case Scott has alleged that Brewer's decision to bar him from VPA property substantially impairs his ability to be employed as a longshoreman in Hampton Roads. Am. Compl. ¶ 61. The plaintiff in *Cafeteria Workers* could have easily worked as a cook in a different location from the military installation where she was barred access. *See McNeill v. Butz*, 480 F.2d 314, 324–25 (4th Cir. 1973) (distinguishing *Cafeteria Workers*, in part, based on the fact that "*Cafeteria Workers* was based in part on the Court's perception that the employee's injury was minimal," whereas the plaintiffs in *McNeill* were more aggrieved). Scott alleges that his inability to enter VPA property "d[oes] in fact prevent Scott from continuing to do any work on the waterfront" and that "[t]here were other employers that Scott could have applied to work with but could not do so because [of] Brewer's decision" to bar Scott from VPA property. Am. Compl. ¶ 55. Accepting the allegations in the amended complaint as true, while longshoremen jobs exist outside of VPA property, they are scant compared to those opportunities that exist on VPA property, and it is

entirely plausible that Scott's inability to enter such property significantly impairs his employment opportunities.[11]

The same distinction can be made with respect to *Artist*. Brewer relies heavily on the *Artist* court's conclusion that "VIT's interest is effectively to manage the government property involved," and that maintenance of VIT's shipping terminals was an "essential government function[ ]." *Artist*, 679 F. Supp. at 594–95 (internal quotation omitted). While assessing the government interest is important, this Court also assessed the plaintiff's interest in *Artist*, stating that "[t]he plaintiff's interest here, like that involved in *Cafeteria Workers*, is to be allowed the opportunity to work at a specific facility." *Id.* at 595. In *Artist*, the plaintiff could have continued work as a truck driver after being barred from one specific terminal. Indeed, the plaintiff did continue as a truck driver for some time after being barred. The hardship faced by Scott is undoubtedly greater, and his interest is more than the opportunity to work at one specific facility.[12]

Further, in *Cafeteria Workers*, the Court explained that the case was not one in which the plaintiff was excluded for a reason that was "patently arbitrary or discriminatory." *Cafeteria Workers*, 367 U.S. at 898. By contrast, Scott alleges that he was treated in a discriminatory fashion. Am. Compl. ¶ 14. While Brewer's stated reason for Scott's exclusion unquestionably differs, at this stage the Court is required to accept the allegations in the amended complaint as true.

---

[11] The Court also notes that Scott has been a longshoreman for 30 years, rendering a change in career unlikely and difficult.

[12] In *Artist*, the court also found it significant that the plaintiff admitted to getting into a fight. *Artist*, 679 F. Supp. at 594. While Brewer points to this as a connecting thread between *Artist* and this case, Scott's admission as to what he said to his co-workers is, at the very least, more equivocal than admitting that Brewer's version of events is true.

Accordingly, Scott has stated a claim for denial of due process related to the deprivation of a constitutionally-protected liberty interest in the ability to access VPA property and thereby work as a longshoreman in Hampton Roads.

**ii.    Scott did not have a property interest in his badge or credentials.**

Next, Brewer argues that Scott "fails to show any legitimate property interest." ECF No. 36 at 19. "Property interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985) (quoting *Roth*, 408 U.S. at 577). Scott asserts that once he completed the requirements to receive his badge and credentials he "acquired a vested interest in his continued possession" of the same. ECF No. 45 at 18.

It has been oft-stated that "a federal employee does not have a constitutional due process interest in a security clearance." *Humble-Sanchez v. Chertoff*, No. EDCV 07-222-VAP, 2008 WL 11338642, at *4 (C.D. Cal. Aug. 20, 2008) (citing *Robinson v. Dep't of Homeland Sec.*, 498 F.3d 1361, 1364–65 (Fed. Cir. 2007)). In one such case, cited by Brewer, the Federal Circuit stated that "[g]overnment credentials and access badges are not the personal property of the credentialed individual, but are government-issued documents indicating that the holder is entitled to special access to restricted government premises or materials." *Fuller v. Dep't of Navy*, 465 F. App'x 949, 952 (Fed. Cir. 2012). These cases are not directly applicable to the case before us, as they generally have interpreted 5 U.S.C. § 7513,[13] a statute which is inapplicable to

---

[13] Section 7513 governs the procedures due certain federal employees who have been terminated. Scott was not a federal employee. When a federal security clearance has been denied or revoked, courts are limited to determining "whether having a security clearance was a requirement of the employee's position, and whether the agency followed the prescribed procedures set forth in 5 U.S.C. § 7513." *Fuller*, 465 F. App'x at 951 (citing *Hesse v. Dep't of State*, 217 F.3d 1372,

this case. *See, e.g., Dep't of Navy v. Egan*, 484 U.S. 518, 522 (1988).  Such cases have dealt with federal employees with federal security clearances, as opposed to the state security clearance here.

Nevertheless, the Court finds that analogy to these cases is appropriate.  In *Egan*, the Supreme Court wrote that "[i]t should be obvious that no one has a 'right' to a security clearance . . . the grant of security clearance to a particular employee [is] a sensitive and inherently discretionary judgment call."[14]  *Id.* at 527–28.  This statement is not rendered false just because it is placed in a state context.  Further, Scott does not point to any state law that grants him a property right in the badge and credentials.  Indeed, Scott's argument is devoid of any citation to authority.[15]

Accordingly, Scott has no property interest in his badge and credentials.

---

1376 (Fed. Cir. 2000)).  Courts reviewing denial of state security clearances have not been held to be so limited.  Notably, section 7513 provides that, prior to revoking an employee's security clearance, the employee be given an opportunity to respond with a statement and to compile supporting evidence. 5 U.S.C. § 7513(b)(2).

[14] In *Artist*, on appeal, the Fourth Circuit considered *Egan* inapplicable due to its focus on the procedural rights of section 7513.  *Artist*, 857 F.2d 977, 978 n.3 (4th Cir. 1988).

[15] This ruling does not contradict the Court's ruling with respect to Scott's liberty interest. Property interests are created by state law, and Scott has not pointed to any state law that gives rise to any property interest.  A liberty interest in the right to pursue one's occupation needs no state law reference.  Further, there was a security clearance at issue in *Cafeteria Workers*, but the Supreme Court indicated that, had the facts been different (had the plaintiff alleged discrimination, for instance), a hearing may still have been appropriate. *Cafeteria Workers*, 367 U.S. at 898.

### iii.    Brewer's actions did implicate Scott's liberty interest in his reputation.

Injury to reputation alone is not a liberty interest protected by the Due Process Clause. *Siegert v. Gilley*, 500 U.S. 226, 233 (1991). However, a public employer may not deprive an employee of his or her "freedom to take advantage of other employment opportunities." *Roth*, 408 U.S. at 573. Thus, a liberty interest under the Fourteenth Amendment "is implicated by public announcement of reasons for an employee's discharge." *Johnson v. Morris*, 903 F.2d 996, 999 (4th Cir. 1990).

In order to state a claim based on harm to reputation, "a plaintiff must allege that the charges against him:  (1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination or demotion; and (4) were false." *Sciolino v. City of Newport News*, 480 F.3d 642, 646 (4th Cir. 2007) (citing *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 n.5 (4th Cir. 1988)).  As an initial matter, the Court notes that Brewer is not Scott's employer, making this an atypical scenario for such a claim. Nevertheless, the Court will address each of the elements in turn.

With respect to the first prong, "[t]he type of communication that gives rise to a protected liberty interest implies 'the existence of serious character defects such as dishonesty or immorality.'" *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 308 (4th Cir. 2006) (quoting *Robertson v. Rogers*, 679 F.2d 1090, 1092 (4th Cir. 1982)).  Brewer does not challenge this prong, and the Court will assume that allegations that Scott made threats and is a security concern are allegations of serious character defect.

With respect to the second prong, the Fourth Circuit clarified the publication requirement in *Sciolino*:

> A plaintiff need not allege that his file has actually been disseminated to particular prospective employers.  But, he must allege more than that his file "may be

35

available" to them. We thus hold that an employee must allege (and ultimately prove) a likelihood that prospective employers (i.e., employers to whom he will apply) or the public at large will inspect the file.

*Sciolino*, 480 F.3d at 650. The Fourth Circuit went on to state that this standard can be met in two different ways. *Id*. First, the plaintiff can allege that the defendant releases personnel files to all inquiring employers as a matter of course. *Id*. Second, the plaintiff can allege that, even though defendant releases files only to certain employers, plaintiff intends to apply to one of those employers. *Id*.

Scott asserts that he satisfied the publication requirement in paragraphs 8 and 22 of the amended complaint. ECF No. 45 at 19. Paragraph 8 alleges that "Brewer illegally publicized untrue statements and innuendo that Scott engaged in inappropriate acts, including false statements that accused Scott of potential criminal activity." Am. Compl. ¶ 8. Paragraph 8 then proceeds to name individuals who were former co-workers of Scott's as recipients of such statements. *Id*. There is no allegation in paragraph 8 that references potential employers, and so this paragraph cannot satisfy the publication requirement of *Sciolino*.

Paragraph 22 alleges that "Brewer placed false and derogatory information in Scott's security clearance records and file . . . [and published] this information to prospective private and public employers of Scott and to private third parties." Am. Compl. ¶ 22. Scott then names the same former co-workers. *Id*. Scott has thus gone beyond the standard in *Sciolino*, and has alleged that Brewer has actually disseminated such information to prospective employers. Assuming the allegations to be true, Scott has met the publication element.

Of further importance to this prong, Scott alleges that "[o]ther potential employers in the longshore industry of Hampton Roads would likely request information from VIT and VPA from its records regarding Scott's disciplinary records, his security clearance records with VPA and

VIT, and will further inspect the reasons for the ending of Scott's long-term work and employment as a longshoreman with VIT." Am. Compl. ¶ 19. Again, the Court is required at this stage to accept Scott's allegations as true. Brewer argues that Scott provides no reason potential employers would request VPA records, but the Court considers it plausible that potential employers would seek out VPA information about a potential longshoreman applicant, especially one against whom the VPA has taken some action. Scott has alleged a likelihood of potential employers reviewing this information, and has thus satisfied the second prong from *Sciolino*.

As to the third prong, the action must accompany an "alteration of legal status which, combined with the injury resulting from the defamation, justified the invocation of procedural safeguards." *Paul v. Davis*, 424 U.S. 693, 708–09 (1976). In the typical case, the change in legal status is a termination or demotion of an employee by an employer. In this case, the alleged change in legal status is the disbarment from VPA property. This complicates Scott's claim, because government action that makes it more difficult for a plaintiff to find private employment is not necessarily an alteration in legal status.[16] *See Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 315–16 (4th Cir. 2012) ("the Coast Guard's action may have affected Shirvinski's *private* employment prospects . . . [b]ut unlike the loss of a government job, that injury does not work a change in legal status"). In *Shirvinski*, the Fourth Circuit joined the District of Columbia Circuit Court of Appeals in holding that the plaintiff "must show that his 'skills were . . . rendered largely unmarketable as a result of the agency's acts.'" *Id.* at 316 (quoting *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1507 (D.C. Cir. 1995)).

---

[16] Scott did not lose his employment at VIT due to Brewer's actions, but because VIT independently made the decision to terminate his employment.

In *Taylor*, the D.C. Circuit identified two ways in which a plaintiff can show that government interference with future employment prospects may work a change in status. *Taylor*, 56 F.3d at 1506. First, the plaintiff can show that the government's action "formally or automatically excludes [the plaintiff] from work on some category of future [government] contracts or from other government employment opportunities." *Id.* (citing *Kartseva v. Dep't of State*, 37 F.3d 1524 (D.C. Cir. 1994)). Second, "the plaintiff may demonstrate that the government's action precludes him—whether formally or informally—from such a broad range of opportunities that it 'interferes with [his] constitutionally protected right to follow a chosen trade or profession.'" *Id.* (quoting *Kartseva*, 37 F.3d at 1529) (internal quotations omitted).

Scott has adequately alleged that Brewer's actions in barring him from VPA property have precluded him from such a broad range of opportunities that his skills have been rendered largely unmarketable. Reading the amended complaint, Scott's inability to enter VPA property is likely to be a serious handicap to his ability to find employment as a longshoreman in the state of Virginia, let alone in Hampton Roads. While Brewer asserts that Scott can find employment as a longshoreman on private property, Scott has alleged numerous times that his exclusion from VPA property effectively bars him from working as a longshoreman. *See, e.g.*, Am. Compl. ¶ 55. The cases Brewer cites are distinguishable. In *Blackout Sealcoating, Inc. v. Peterson*, 733 F.3d 688, 690 (7th Cir. 2013) and *Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1269 (10th Cir. 1989), the Seventh Circuit and Tenth Circuit respectively affirmed dismissals of claims where plaintiffs failed to allege that they had actually applied for employment and been turned down, and merely alleged prospective damage. In this case, and contrary to Brewer's assertions, Scott alleges that "such damaging information has been seen by prospective employers of Scott to whom Scott has already applied for employment, but was denied employment, on the basis of

38

the information provided by VIT and the VPA." Am. Compl. ¶ 21.  While Scott does not name the employers specifically, Scott clearly alleges that he has already been denied employment which, if true, removes this case from the realm of mere speculation.  Brewer further quotes *Blackout Sealcoating* for the proposition that "'removal of one [job or] employer from the universe of all jobs does not affect occupation liberty.'"  ECF No. 52 at 8 (quoting *Blackout Sealcoating*, 733 F.3d at 690).  Scott's exclusion from VPA property removes more than one employer from Scott's employment opportunities.   Given the allegations in the amended complaint, the Court does not recommend dismissal of Scott's claim based on Brewer's argument that Scott can find employment elsewhere.

The final prong is that the information must be false.  Brewer asserts that Scott admitted that he told his co-workers that he would "kill them," and therefore Brewer's statements about Scott's dangerous activity are true.  ECF No. 36 at 22.  Scott contests that Brewer's statements are false, because they are divorced from the context of the harassment made by Scott's co-workers and his concerns about self-defense.   Assuming the allegations in Scott's amended complaint to be true, Scott's statement takes on a different meaning whether viewed in context or in isolation, such that any statements made by Brewer that Scott engaged in criminal activity can be taken as false when viewed in context.  Because Scott meets the requirements of *Sciolino*, he adequately states a claim for denial of a liberty interest in reputation.

For the reasons stated above, the Court recommends that Brewer's motion to dismiss the claims against him in his individual capacity be **GRANTED** and such claims be **DISMISSED** with **PREJUDICE**.  The Court recommends that Brewer's motion to dismiss the claims against him in his official capacity be **DENIED,** insofar as Scott asserts a liberty interest, and **GRANTED** insofar as Scott asserts a property interest.

**C. Scott fails to state a claim against the Hampton Roads Shipping Association.**

Count four alleges that the HRSA breached the CBA by not maintaining Scott's port number "as active until Scott had a review of his employment status by the Contract Board or otherwise." Am. Compl. ¶ 85. The HRSA argues that Scott's claims against it should be dismissed for failure to state a claim because the HRSA does not control access to port numbers. ECF No. 40 at 3–5.

According to the amended complaint, "[t]he CBA of the parties created the Port Number Review Committee ['PNRC'] as a sub-committee of the Contract Board." Am. Compl. ¶ 82. Section 25 of the CBA defines the contract board as an entity comprised of HRSA management and labor union members which administers and interprets the CBA. ECF No. 10-1 at 18–21. The PNRC is responsible for maintaining port numbers. Like the contract board, the PNRC is made up of equal members of HRSA and Local 1624. Am. Compl. ¶ 77, ECF No. 10-1 at 18.

According to the HRSA, it has no control over the PNRC. It is true that the HRSA does not have *exclusive* control over the contract board or the PNRC, as such control is shared with Local 1624. Nevertheless, the HRSA is given an integral role in interpreting and administering the CBA, and in maintaining port numbers. The CBA refers to the HRSA members of the contract board as *representatives* of HRSA. ECF No. 10-1 at 14. In other words, they serve on the contract board pursuant to their responsibilities with HRSA, not as an unrelated side project. The two relevant letters in this case, one to Scott, ECF No. 32-7, and the other to Scott's counsel, ECF No. 32-8, are written on HRSA letterhead and signed by the executive vice-president of the HRSA. While these letters do explain that the PNRC was contemplating the removal of Scott's port number, they still demonstrate the error in HRSA's claim that it has no role in the maintenance of port numbers. HRSA officials serve on the PNRC, at the HRSA's behest, to

40

conduct one of the HRSA's primary responsibilities, administering the CBA. Accordingly, suit against the HRSA is proper.

Scott must still demonstrate that HRSA violated the law, however. The HRSA argues that it does not owe a duty to Scott under the CBA. According to Scott, the CBA requires the HRSA and PNRC to "protect Scott's Port Number and to maintain its status as active until Scott had a review of his employment status by the Contract Board or otherwise." Am. Compl. ¶ 85. As with all of Scott's other allegations regarding breach of the CBA, Scott fails to point to specific language in the CBA. Regarding the PNRC and port numbers, the CBA, in a 2013 amendment, provides that "[t]he Port Number Review Committee shall review port numbers on a quarterly basis and may revoke or reinstate port numbers." ECF No. 10-1 at 50. It further specifies that the PNRC must "provide written notice to the employee and his Local prior to any declaration of ineligibility and shall meet before taking any action." *Id.* Finally, it specifies the procedures for filing a petition for reinstatement of one's port number. *Id.* Nowhere does the CBA require the PNRC to maintain Scott's number pending review of his employment status by the Contract Board.[17] The CBA does not establish the specific duty which Scott accuses the HRSA of having breached.

Scott argues the LMRA "specifically provides for the inclusion of HRSA with the action against Scott's union in a hybrid action for the union's failure to comply with its duty of fair representation." ECF No. 44 at 3. Scott cites neither the LMRA itself nor caselaw supporting this proposition. To the extent that Scott references the same type of hybrid claim discussed with

---

[17] Scott's amended complaint also indicates that he does not even know whether the PNRC actually deactivated his port number. Am. Compl. ¶ 88. Scott also does not allege, and there is no evidence that, he ever attempted to follow the procedures specified in the 2013 amendment for reinstatement of his port number.

respect to VIT's motion to dismiss, the Court notes that the HRSA was not Scott's employer, and such a hybrid claim would be inapplicable.

Scott further alleges that "ILA Local 1624 owed a duty of representation to Scott to explain to the members of the joint [PNRC] of the circumstances of Scott's challenge to VIT's decision and defendant Brewer's decision that prevented Scott from working to accumulate hours to maintain his port number." Am. Compl. ¶ 84. Count four by its own terms is brought against the HRSA solely, and not against Local 1624. Any duty that may have existed for members of Scott's union to explain Scott's situation to the HRSA members of the PNRC does not impact the HRSA's liability in this case. Further, even if the union did inform HRSA members of the PNRC about Scott's situation, the CBA does not require the PNRC to maintain Scott's port number.

Because the CBA does not create the duty Scott claims has been breached, the Court recommends that count four be **DISMISSED** with **PREJUDICE**.

### D. Count three should be dismissed without prejudice and Scott's entry of default should be denied, because Scott failed to adequately serve Local 1624.

Local 1624 argues that service of process against it was insufficient and, accordingly, that service should be quashed and the complaint dismissed. ECF Nos. 58–59, 61–62. Scott argues that service was proper, Local 1624 failed to answer within 21 days of receiving service in accordance with Federal Rule of Civil Procedure 12(a)(1), and thus the Court should enter a default against Local 1624. ECF No. 64.

Federal Rule of Civil Procedure 4(m) states that:

> [i]f a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

42

There are several ways to properly serve an unincorporated association under the federal rules, as specified in Federal Rule of Civil Procedure 4(h).  First, the plaintiff may complete service in accordance with the state law of the state where the district court sits.  Fed. R. Civ. P. 4(h)(1)(A) (referring to Fed. R. Civ. P. 4(e)(1)).  Under Virginia state law, process against an unincorporated association "may be served on any officer, trustee, director, staff member or other agent."  Va. Code Ann. § 8.01-305.  Further, under Virginia law, "process which has reached the person to whom it is directed within the time prescribed by law, if any, shall be sufficient although not served or accepted as provided [by law]."  Va. Code Ann. § 8.01-288.  Second, the plaintiff may deliver the summons and complaint "to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process."  Fed. R. Civ. P. 4(h)(1)(B).  "'[T]he plaintiff bears the burden of proving adequate service.'"  *Hussain v. ACCA, Inc.*, No. 1:16cv1323, 2016 WL 6962545, at *2 (E.D. Va. Nov. 29, 2016) (quoting *Dickerson v. Napolitano*, 604 F.3d 732, 752 (4th Cir. 2010)).

Courts within the Fourth Circuit have found good cause exists when the plaintiff has made "reasonable, diligent efforts to effect service on the defendant."  *Harper v. Gore*, No. 3:15cv303, 2016 WL 6662697, at *2 (E.D. Va. Nov. 10, 2016) (internal quotations omitted).  In an unpublished case, the Fourth Circuit recently noted six factors that district courts consider when granting an extension of time to serve process:  (1) whether the delay was outside plaintiff's control; (2) whether the defendant was evasive; (3) whether the plaintiff acted diligently or made reasonable efforts to serve process; (4) whether the plaintiff is *pro se* or *in forma pauperis*; (5) whether the defendant would be prejudiced by an extension; and (6) whether the plaintiff asked for an extension of time before the deadline.  *Scott v. Md. State Dep't of Labor*, 673 F. App'x 299, 306 (4th Cir. 2016).

In this case, service of process was given to Paulette Brown at 1355 International Terminal Boulevard, Norfolk, Virginia 23505. ECF No. 56. That address belongs to the Hampton Roads District Council ("HRDC"), where Ms. Brown is employed as a receptionist. ECF No. 67-1 at 3–4. The HRDC is a representative trade association, of which Local 1624 is a dues-paying member. *Id.* at 3. While the HRDC and Local 1624 share that connection, and members of Local 1624 attend periodic meetings at the HRDC, they are not the same entity, and the receptionist for the HRDC is not authorized to accept service on the union's behalf, *id.* at 3–4, because she is not an "officer, trustee, director, staff member or other agent" of Local 1624.

Local 1624's address is 500 East Main Street, Suite 404, Norfolk, Virginia. This address is displayed in several locations on Local 1624's website. ILA Local 1624, *Location*, https://www.ilalocal1624.com/about/location/ (last visited February 6, 2018); *see also* ECF No. 67-1 at 1–2. According to an affidavit by Local 1624's president, Larry A. Bachtell, Mr. Bachtell has personally spoken with Scott at the Main Street address, the address is on all official correspondence from the union, and is also on all its business cards and official public records. ECF No. 67-1 at 4–5. Just the slightest amount of due diligence on Scott's part would have revealed the Main Street address for Local 1624.

Scott has not shown good cause for extending the time for service under Rule 4(m). In regards to the six factors identified by the Fourth Circuit, Local 1624 arguably suffers no prejudice by late service. However, the delay was within Scott's control, the union was not evasive in any way, Scott did not act with reasonable diligence, Scott is represented by counsel, and Scott did not ask for an extension of time. *See Scott*, 673 F. App'x at 306.

Scott argues that Local 1624 nonetheless actually became aware of the summons and complaint, apparently seeking safe harbor under Va. Code Ann. § 8.01-288. ECF No. 64 at 5–6.

Scott cannot show, however, that Local 1624 actually received notice "within the time prescribed by law," particularly because he waited until two days before the deadline before even attempting service. Contrary to Scott's contentions, Local 1624's statement that it became aware of the complaint just prior to Christmas does not prove that it became aware of the complaint prior to December 16, 2017, the deadline for service. *See* ECF No. 64 at 6. Scott's counsel's affidavit establishes only that Local 1624 was aware of the complaint as of January 5, 2018, two days before it filed its motions. ECF Nos. 64-1, 64-2.

Federal Rule of Civil Procedure 55 provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Scott argues that an entry of default against Local 1624 is appropriate. Scott filed his request the day after Local 1624 filed the present motions, ECF Nos. 58–59, defending the case. Scott states that the union has "snubbed its nose at the clear mandate" that it must respond to the complaint within 21 days after personal service.[18] ECF No. 64 at 6. To the contrary, as discussed above, Local 1624 has still not been properly served. Rather, it appears Local 1624 has acted in a relatively diligent manner, filing its motions to quash and to dismiss 24 days after Scott attempted personal service, and seemingly within 21 days of actually learning through the grapevine about Scott's claim against it. In sum, Scott waited until nearly the last moment to attempt to serve Local 1624, served the wrong entity entirely, and then moved for an entry of

---

[18] Incidentally, Scott's amended complaint, Scott's opposition to VIT's motion to dismiss, Scott's opposition to Brewer's motion to dismiss, and Scott's opposition to Local 1624's motion to dismiss, were all filed late. ECF Nos. 32, 45, 46, 64. In none of these instances, did any defendant oppose Scott's requests to untimely file those documents *nunc pro tunc*. ECF Nos. 33, 47, 65.

default after Local 1624 had already filed a motion to quash and to dismiss. An entry of default is not warranted in this case.

For these reasons, the Court **RECOMMENDS** that Scott's request entry of for default against Local 1624 be **DENIED**. Additionally, the Court **RECOMMENDS** that Local 1624's motions to quash service of process and to dismiss be **GRANTED** and count three be **DISMISSED** without **PREJUDICE**.

## V.    CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that VIT's motion to dismiss, ECF No. 37, be **GRANTED** and that count two be **DISMISSED** with **PREJUDICE**, and count five be **DISMISSED** without **PREJUDICE**, Brewer's motion to dismiss, ECF No. 35, be **GRANTED in part** and **DENIED in part** and count one be **DISMISSED** with **PREJUDICE** as against Brewer in his individual capacity, HRSA's motion to dismiss, ECF No. 39, be **GRANTED** and count four be **DISMISSED** with **PREJUDICE**, Local 1624 motions to quash, ECF No. 58, and to dismiss, ECF No. 61, be **GRANTED** and count three be **DISMISSED** without **PREJUDICE**, and Scott's request for entry of default judgment, ECF No. 60, be **DENIED**.

## VI.    REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within 14 days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an

extra three (3) days, if service occurs by mail.   A party may respond to any other party's objections within 14 days after being served with a copy thereof.  *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

Robert J. Krask
United States Magistrate Judge

Robert J.  Krask
United States Magistrate Judge

Norfolk, Virginia
February 7, 2018